**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES MULDOON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PENN STATE HEALTH, THE BOARD OF DIRECTORS OF PENN STATE HEALTH, and THE PENN STATE HEALTH RETIREMENT MANAGEMENT COMMITTEE,<br><br>Defendants. | **CIVIL ACTION NO.**: |

## COMPLAINT

Plaintiff, James Muldoon ("Plaintiff"), by and through his attorneys, on behalf of the Penn State Health 401(k) Savings Plan (the "401(k) Plan") and the Penn State Health Tax Sheltered Annuity Program (the "403(b) Plan") (collectively, the 401(k) Plan and the 403(b) Plan are referred to as the "Plans"),[1] himself and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciary, Penn State Health ("Penn State" or the "Company"), the Board of Directors of Penn State Health (the "Board"), and the Penn State Health Retirement Management Committee

---

[1] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

(the "Committee") (collectively, the Company, the Board, and the Committee, are referred to as the "Defendants") for breaches of their fiduciary duties.

2.    The Plans are a defined contribution retirement plans, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enable eligible participants to make tax-deferred contributions from their salaries to the Plans. *See* Penn State Health 401(k) Savings Plan, Summary Plan Description as of January 1, 2024 ("401(k) SPD"), at 1 ("The Savings Plan is a defined contribution pension plan intended to qualify as a profit sharing plan with a qualified cash or deferral arrangement under sections 401(a), 401(k) and 402A of the Internal Revenue Code of 1986, as amended ("Code")."); Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the 403(b) Plan, at 6 ("The Plan is a defined-contribution plan sponsored by Penn State Health (Sponsor)."); *see also* Penn State Health Investment Policy Statement ("IPS"), at 2 ("The Penn State Health Section 401(k) Savings Plan and the Penn State Health Tax Sheltered Annuity Program ("the Plans") are defined contribution retirement savings plans maintained by Penn State Health (the "Plan Sponsor")").

3.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

4.    The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent

process for selecting investment options and service providers." [2]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

7.      Because cost-conscious management is fundamental to prudence in the investment function the concept applies not only to investments, but to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees ("RKA").

8.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

9. The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022).

10. At all times during the Class Period, the Plans had, combined, over one billion dollars in assets under management. At the start of the Class Period in 2019, the 401(k) Plan had $1,646,231,456 and the 403(b) Plan had $282,489,029 in assets under management. *See* Schedule H, attached to 2019 Form 5500s for the 401(k) Plan and 403(b) Plan, at 2.

11. By 2023, the 401(k) Plan had $2,572,018,199 and the 403(b) Plan had $444,288,473 in assets under management. *See* Schedule H, attached to 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, at 2. Collectively, the Plans had over $3 billion in assets under management in 2023.

12. The Plans' assets under management qualifies them collectively as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[3] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plans.[4]

13. The Plans are also large in terms of the number of its participants. At the beginning of the Class Period, the 401(k) Plan had 15,020 participants and the 403(b) Plan had 2,327

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

participants. *See* 2019 Form 5500s for the 401(k) Plan and 403(b) Plan, at 2. By 2023, the 401(k) Plan had 22,031 participants and the 403(b) Plan had 3,428 participants. *See* 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, at 2. Collectively, the Plans had over 25,000 participants in 2023. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 194 defined contribution plans (401k, 401a, and 403b) in the country with between 20,000 and 29,999 participants with account balances.

14. The marketplace for retirement plan services is established and competitive. Accordingly, because of its large number of participants and asset size, the 401(k) Plan had substantial bargaining power to obtain high-quality, low-cost RKA services. Defendants, however, did not try to reduce the 401(k) Plan's expenses to ensure they were prudent. Rather, Defendants allowed unreasonable expenses to be charged to participants for RKA services from 2019 through at least 2023.

15. Defendants also caused the Plans to enter into an arrangement with Great-West Life & Annuity Insurance Co. ("Great West"), a party in interest, under which Great West received millions of dollars in exchange for recordkeeping services rendered to the Plans. Defendants' conduct was especially egregious given that Great West received additional income from certain of the Plan's investment securities, described below. This arrangement with Great West is a prohibited transaction because it "amounts to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

16. With regard to the Plans' investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining certain a guaranteed investment contract ("GIC") in the

Plans with lower crediting rate when compared to available similar or identical investments with higher crediting rates, both within the 401(k) Plan and outside of the Plans. The crediting rate is the guaranteed rate of return for the investment fund.

17.    Specifically, Defendants allowed substantial assets in the Plans to be invested in a guaranteed investment contract with Great West (the "Great West GIC"), that provided significantly lower rates of return than comparable stable value funds that Defendants could have made available to Plan participants, including in a traditional annuity contract, the TIAA Traditional Annuity Contract (the "TIAA GIC"), in the Plans.

18.    A prudent fiduciary would not have included these underperforming investment options that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

19.    Great West benefited significantly from participants in the Plans investing in the Great West GIC. A prudent fiduciary who adequately monitored the Plans' investments and placed the interests of participants in the Plans above all would have recognized that the Great West GIC was benefitting Great West at the expense of the participants in the Plans. The investments in the Great West GIC were held and invested by Great West, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plans' participants). The crediting rates that Great West provided to the Plans were and are so low that Great West reaped a windfall on the spread.

20.    Plaintiff also alleges that Defendants breached the duties they owed to the 401(k) Plan, to Plaintiff, and to the other participants of the 401(k) Plan by failing to defray[] reasonable expenses of administering the [Plan]. 29 U.S.C. § 1104(a)(A)(ii). Its failure stems from the use of 401(k) Plan participant forfeited funds to reduce employer contributions to the 401(k) Plan instead

of using the funds to reduce or eliminate the amounts charged to 401(k) Plan participants for Plan administrative costs. This action by the Defendants was a clear breach of the duties of prudence and loyalty to 401(k) Plan participants and cost 401(k) Plan participants millions of dollars.

21.     Plaintiff alleges that during the putative Class Period, Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, to Plaintiff, and to the other participants of the Plans by, *inter alia*, (1) failing to objectively and adequately review the Plans' investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; (2) failing to control the 401(k) Plan's recordkeeping and administration costs; (3) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C); and (4) failing to defray reasonable expenses of administering the 401(k) Plan.

22.     Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

23.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I), breach of the fiduciary duty of loyalty (Count II), breach of ERISA's Anti-Inurement Provision (Count III), failure to monitor fiduciaries (Count IV) and violation of ERISA's prohibited transactions (Count V).

## II.     JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

25.     This Court has personal jurisdiction over Defendants because the Plans are administered in this District meaning Penn State transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

26.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Penn State does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

### Plaintiff

27.     Plaintiff, James Muldoon ("Muldoon"), resides in Carlisle, Pennsylvania. During his employment, Plaintiff Muldoon participated in the 401(k) Plan and 403(b) Plan. Mr. Muldoon invested in the Great West GIC in the 403(b) Plan and suffered injury to his 403(b) Plan account due to the significant underperformance of the Great West GIC. In addition, Plaintiff Muldoon also suffered injury to his 401(k) Plan account by paying excessive RKA costs.

28.     Plaintiff has standing to bring this action on behalf of the Plans because he participated in the Plans and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his accounts currently, or as of the time his accounts were distributed, and what his accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

8

29.    Further, Plaintiff has standing to bring this action on behalf of the Plans even if he only participated in one of the Plans because "[a]n individual in one ERISA benefit plan can represent a class of participants in numerous plans other than his own, if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans." *Fallick v. Nationwide Mutual Ins. Co.,* 162 F.3d 410, 422 (6th Cir. 1998); *see also Dann v. Lincoln Natl. Corp., et al.,* 708 F.Supp.2d 481, 487 (E.D. Pa. 2010); *Mulder v. PCS Health Sys., Inc.*, 216 F.R.D. 307, 317 (D.N.J. 2003) ("Mulder has standing to pursue his claims on behalf of members of other employee benefit plans included in the definition of the class.").

30.    Here, the Plans were sponsored by the Company and administered in the same manner, including having the Great West GIC as an investment option in both Plans.

31.    Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**<u>Defendants</u>**

***Company Defendant***

32.    Penn State is the sponsor of the Plans and a named fiduciary of the Plans with a principal place of business at 100 Crystal A Drive, Hershey, PA 17033. *See* 2023 Form 5500s for the 401(k) Plan and 403(b) Plan, at 1; *see also* Plan Doc., at 15 ("'Plan Sponsor' shall mean Penn State Health, a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania."). "Penn State Health is an integrated academic health system serving patients and communities across 15 counties in central Pennsylvania."[5]

---

[5] *See* https://www.pennstatehealth.org/about-us, last accessed on June 23, 2025.

33. The Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). Penn State, directly or by acting through its Board, appointed the Committee.

34. Further, at all times, Penn State acted through its officers to perform Plan-related fiduciary functions. These officers were acting in the course and scope of their employment.

35. Accordingly, during the putative Class Period, Penn State is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

### Board Defendants

36. "The Board of Directors may appoint another person or committee to be the Plan Administrator at any time. The Board of Directors may also remove a Plan Administrator and fill any vacancy which exists." Plan Doc., at 99.

37. Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

38. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

### Committee Defendants

39. "The Retirement Management Committee (the "Committee") is hereby designated as the administrator of the Plan (within the meaning of Section 3(16)(A) of ERISA). The Plan Administrator shall have the authority to control and manage the operation and administration of

the Plan as the named fiduciary under Section 402(a)(1) of ERISA." Plan Doc., at 99; see also

Penn State Health 401(k) Savings Plan, Summary Plan Description ("SPD"), as of January 1, 2024,

at 19 ("The Retirement Management Committee administers the Plan and is the 'Plan

Administrator' as that term is defined by ERISA. The Plan Administrator has the discretionary

authority and responsibility: (1) to interpret and apply the Plan's provisions in its sole discretion,

(2) to interpret the Plan in order to make eligibility and benefit determinations as it may determine

in its sole discretion, (3) to make factual determinations as to whether any individual is entitled to

receive any benefits under the Plan, and (4) to make the rules and regulations necessary for the

day-to-day operation of the Plan.").

40.    "The Committee shall perform the functions of an investment fiduciary responsible

for the prudent management of the Plans' assets and investment options." IPS, at 3

41.    Each member of the Committee during the putative Class Period (referred to herein

as John Does 11-20) is/was a fiduciary of the Plans, within the meaning of ERISA Section

3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each had control over plan

management and/or authority or control over management or disposition of plan assets.

42.    Members of the Committee during the Class Period are collectively referred to

herein (referred to herein as John Does 11-20) as the "Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS[6]

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plans because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plans and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

43.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following proposed class ("Class"):

> All persons, except Defendants and any fiduciary of the Plans and their immediate family members, who were participants in or beneficiaries of the Penn State Health 401(k) Savings Plan and/or the Penn State Health Tax Sheltered Annuity Program at any time between June __, 2019 to the date of judgment (the "Class Period").[7]

44.     The members of the Class are so numerous that joinder of all members is impractical. The 2023 401(k) Plan Form 5500 lists 22,031 "participants with account balances as of the end of the plan year." 2023 401(k) Form 5500, at 2. The 2023 403(b) Form 5500 lists 3,428 "participants with account balances as of the end of the plan year." 2023 403(b) Form 5500, at 2.

45.     Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plans and suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiff consistently with other Class members, and managed the Plans as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

46.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.     Whether Defendants are fiduciaries of the Plans;

    B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

---

[7] Plaintiff reserves their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

     C.     The proper form of equitable and injunctive relief; and

     D.     The proper measure of monetary relief.

47.     Plaintiff will fairly and adequately represent the Class, and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action, and anticipates no difficulty in the management of this litigation as a class action.

48.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

49.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLANS

### A.    The 401(k) Plan

50.    "The 401(k) Plan is a defined contribution pension plan intended to qualify as a profit sharing plan with a qualified cash or deferral arrangement under sections 401(a), 401(k) and 402A of the Internal Revenue Code of 1986, as amended ("Code")." SPD, at 1.

*Eligibility*

51.    Employees can become 401(k) Plan participants "as of the payroll period following satisfaction of" becoming eighteen-years-old. *See* SPD, at 2.

52.    Participants can start "receiving the Basic Contribution as of the payroll period following "[c]ompleting 6 months of service if hired or rehired before January 1, 2024, or completing 12 months of service if hired or rehired on or after January 1, 2024." SPD, at 2.

53.    The 403(b) Plan includes an automatic enrollment feature. "The automatic enrollment date is the first pay date that is at least *90 days* after the date the employee first has an Hour of Service as an eligible employee." *Id*., at 9.

*Contributions*

54.    "A 401(k) Participant may elect to defer a portion of each payment of Compensation for each Payroll Period that would otherwise be made to him or her, after the election becomes effective and while it remains effective pursuant to paragraph 4.4, equal to any whole percentage from 1% to 75%." Plan Doc., at 25-26.

55.    "The Employer shall contribute 5% of each Participant's Compensation for each Payroll Period to the Trust Fund and credit it to the Participant's Nonelective Contribution Account. The Nonelective Contribution will be made notwithstanding a Participant's status as a 401(k) Participant or his eligibility to become a 401(k) Participant." *Id*.

14

56.     Further, "A Basic Contribution shall be made in each Plan Year in an amount equal to 5% of each Participant's Compensation up to the Integration Level and 10% of each Participant's Compensation in excess of the Integration Level." *Id*., at 31.

57.     "The allocation of Basic Contributions shall be made promptly after the appraisal of the Trust Fund." *Id*., at 32

***Vesting***

58.     "At all times a Participant's interest in his or her Elective Deferral Contribution Account, Roth Elective Deferral Contribution Account, Nonelective Contribution Account, Qualified Non-Elective Contribution Account, and in his or her Transfer Account shall be 100% vested and nonforfeitable." *Id*., at 94.

59.     "A Participant's interest in his or her Basic Contribution Account shall fully vest and be nonforfeitable upon completion of three Years of Service." *Id*., at 94.

***Forfeitures***

60.     "Upon termination of the Participant's employment with the Employer and all Affiliates for any reason at any time . . . [t]he nonvested portion of [the Basic Contribution] Account, if any, shall be forfeited." *Id*.

61.     "Forfeitures arising under the Plan may be applied, in the sole discretion of the Plan Administrator, to reinstate forfeited accounts pursuant to Article X, to pay eligible Plan expenses under paragraph 11.6, and/or to reduce Basic Contributions or other Employer contributions required to be made to the Plan." Third Amendment to the Penn State Health 401(k) Savings Plan, at 2.

***GICs in the 401(k) Plan***

62.     Included in the 401(k) Plan's available funds were guaranteed investment contracts that consist of the Great West GIC and TIAA traditional annuity contracts.

63.     At the end of 2019, $61,570,512 in 401(k) Plan assets were invested in the Great West GIC, and $64,008,762 in 401(k) Plan assets were invested in the TIAA Traditional Annuity Contract. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2019, attached to 2019 401(k) Form 5500, at 21.

64.     By the end of 2023, $82,676,884 in 401(k) Plan assets were invested in the Great West GIC, and $65,048,062 in 401(k) Plan assets were invested in the TIAA Traditional Annuity Contract. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2023, attached to 2023 401(k) Form 5500, at 20.

65.     The chart below demonstrates the amount of 403(b) Plan assets invested in the GICs during the Class Period.

| Plan Year | 401(k) Plan Assets in Great West GIC | 401(k) Plan Assets in TIAA Traditional Annuity Contract |
|---|---|---|
| 2019 | $61,570,512 | $64,008,762 |
| 2020 | $77,127,572 | $63,659,938 |
| 2021 | $77,129,921 | $62,844,036 |
| 2022 | $86,523,113 | $63,958,684 |
| 2023 | $82,676,884 | $65,048,062 |

**B.      The 403(b) Plan**

66.     "The 403(b) Plan is a defined-contribution plan sponsored by Penn State Health (Sponsor)." Auditor's Report, attached to 403(b) 2023 Form 5500, at 6.

Contributions

67.     "The Plan permits eligible employees to make annual contributions of up to 100 percent of eligible compensation through a salary deferral election. Employee rollover and Roth contributions are also permitted. Participants who have attained age 50 before the end of the Plan

year are eligible to make catch-up contributions. Contributions are subject to certain limitations."

*Id.*

### GICs in the 403(b) Plan

68.     Included in the 403(b) Plan's available funds was the Great West GIC. *Id.*, at 13-14.

69.     The 403(b) Form 5500s do not identify the amount of 403(b) Plan assets invested in the Great West GIC.

## VI.     THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.     ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

70.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

71.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

72.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

73.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

74.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

75.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

76.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

77.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

78.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

79.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

80.    To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

81.    The Plans' IPS states, that the "Committee shall monitor the Investment Options at least quarterly or as circumstances warrant." IPS, at 5.

82.    For the stable value funds investment options, the Committee shall consider the following factors:

- Issuer financial strength;
- Underlying assets;
- Contract provisions;
- Market to book value ratios;
- Termination features and put options;
- Portability to another recordkeeper;
- Restrictions on participant withdrawals or transfers;
- Minimum guaranteed rates;
- Current crediting rates; and /or
- Methodology for determining future crediting rates.

19

IPS, at 6.

83.     Plaintiff does not have access to Defendants' Committee meeting minutes and, as a result, Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

84.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

85.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

86.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Great West GIC in the Plans throughout the Class Period that wasted the assets of the Plans and the assets of participants because of unnecessary costs and underperformance.

**B.    Defendants Breached Their Fiduciary Duties by Causing the Plans to Offer the Great West GIC**

**1.    Overview of GICs**

87.    For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs.

88.    GICs are issued by insurance companies in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified period.

89.    There are several different types of stable value investments in the retirement plan marketplace. Large plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.

90.    Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because there is only one "wrap" provider. For separate account GICs, the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer. As a result, separate account GICs offer higher crediting rates.

91.    And General account products, such as the Great West GIC, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds, because they are more vulnerable to single entity credit risk and are riskier than separate account GICs. Consequently, general account GICs offer the highest rates.

92.    Because the funds are kept in unrestricted accounts, they are generally subject to claims and liabilities asserted against the insurer. Such funds are subject to single entity credit risk,

meaning the insurer is the sole entity responsible for paying such funds. If the insurer fails to pay funds, no other entity will satisfy the loan.

### 2.    The Plans' Inclusion of the Great West GIC

93.    At all relevant times, Defendants maintained the authority to exercise control over the Plans' investments, including the Plans' Great West GIC.

94.    Great West establishes the crediting rates for its GIC with the Plans. Great West is "obligated to repay the principal and a specified interest rate guaranteed to the Plan." Auditor's Report attached to 2023 Form 5500 for the 401(k) Plan, at 15; Auditor's Report attached to 2023 Form 5500 for the 403(b) Plan, at 13.

95.    Great West earns a "spread" equal to the difference between the crediting rate and the returns Great West earns on the funds in its general accounts.

### 3.    There are Many GICs in the Marketplace with Competitive Crediting Rates

96.    The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

97.    Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plans, but were not selected by Defendants.

98.    The Great West GIC in the Plans had underwhelming crediting rates when compared against GICs provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[9] |
|---|---|---|---|---|---|

---

[9] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| Year | Plan | Participants | Assets | Provider | Rate |
|---|---|---|---|---|---|
| **2019** | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln Financial Group | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Penn State 401(k) Plan** | **15,020** | **$1,646,231,456** | **Great West GIC** | **1.95%** |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Penn State 401(k) Plan** | **20,437** | **$1,966,544,140** | **Great West GIC** | **1.90%** |
| | | | | | |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Penn State 401(k) Plan** | **22,336** | **$2,503,170,076** | **Great West GIC** | **1.65%** |
| | | | | | |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |

|  | | | | |
|---|---|---|---|---|
|  | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
|  | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
|  | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
|  | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| **Penn State 401(k) Plan** | **22,149** | **$2,142,657,407** | **Great West GIC** | **1.55%** |
|  |  |  |  |  |
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
|  | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
|  | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |

| | | | | |
|---|---|---|---|---|
| Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| **Penn State 401(k) Plan** | **22,031** | **$2,572,018,199** | **Great West GIC** | **1.55%** |

99.    Throughout the Class Period, the Great West GIC in the Plans underperformed the comparator funds by an average of over 56%, as demonstrated in the table below.

| Year | Great West GIC Rate of Return | Comparator Average Rate of Return | Great West GIC Percentage of Underperformance |
|---|---|---|---|
| 2019 | 1.95% | 3.94% | 50.51% |
| 2020 | 1.90% | 3.75% | 49.33% |
| 2021 | 1.65% | 4.19% | 60.62% |
| 2022 | 1.55% | 4.06% | 61.82% |
| 2023 | 1.55% | 3.85% | 59.74% |
| **Average Underperformance during Class Period** | | | **56.40%** |

100.    In short, because the Plans held between $1.9 billion and $3 billion combined in assets under management throughout the Class Period, they had considerable leverage to bargain for higher crediting rates.

> **4.    The Alternate GIC (the TIAA-CREF GIC) in the Plans Outperformed the Great West GIC**

101.    Even more compelling evidence that the Great West GIC was an imprudent investment option in the Plans is the fact that the alternative GIC in the Plans had substantially higher crediting rates than the Great West GIC, as demonstrated in the chart below.

| Year | Great West GIC Rate of Return in 401(k) Plan | TIAA-CREF GIC Rate of Return in 401(k) Plan[10] |
|------|------|------|
| 2019 | 1.95% | 3.98% |
| 2020 | 1.90% | 3.95% |
| 2021 | 1.65% | 3.48% |
| 2022 | 1.55% | 4.12% |
| 2023 | 1.55% | 6 - 6.5% |

102.    A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from Great West and/or by submitting requests for proposals to Great West and other providers of stable value investments.

103.    By selecting the Great West GIC with underperforming crediting rates, Defendants provided participants with investment options that failed to maximize the value of their investments.

104.    With the massive amount of assets invested in the Great West GIC, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[11]

C.    **Defendants Committed a Prohibited Transaction Resulting in Excessive RKA costs for the 401(k) Plan and its Participants**

---

[10] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

[11] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

105.   During the Class Period, Defendants entered into a contract with Great West and TIAA to provide RKA services to the Plans. However, such an engagement is a prohibited transaction under ERISA.

106.   29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

107.   Here, Great West and TIAA were parties in interest to the 401(k) Plan as they were receiving compensation for RKA services, as well as indirect compensation from the 401(k) Plan in the form of revenue share being paid to Great West and TIAA from Great West and TIAA funds in the 401(k) Plan.

### 1.   Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants

108.   The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

109.   There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

> A.   Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B.    Multi-channel participant and plan sponsor access (e.g. phone, web);

C.    Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D.    Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E.    Participant tax reporting services (e.g., IRS Form 1099-R);

F.    Participant confirmations, statements, and standard notices;

G.    Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.    Participant education (e.g. newsletters, web articles, standard communication materials);

I.    Plan consulting (e.g., preapproved document services, operational materials);

J.    Plan consulting (e.g. preapproved document services, operational compliance support).

110.    This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

111.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants.

These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

      a.     Loan processing;

      b.     Brokerage services/account maintenance (if offered by the plan);

      c.     Distribution services; and

      d.     Processing of qualified domestic relations orders.

112.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the 401(k) Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

113.    The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[12] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the

---

[12] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[13]

114.    In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

115.    Recordkeepers for large 401(k) plans and 403(b) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

116.    Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### 2.    The 401(k) Plan's Recordkeeping Fees were Excessive

117.    Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the

---

[13] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

118.    As demonstrated in the charts below, the 401(k) Plan's participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

119.    The 401(k) Plan's per participant RKA fees were as follows:

| Plan Year | Participants | Total RKA Reported[14] | $PP |
|---|---|---|---|
| 2019 | 15,020 | $935,909 | $62.31 |
| 2020 | 20,437 | $1,724,145 | $84.36 |
| 2021 | 22,336 | $2,115,711 | $94.72 |
| 2022 | 22,149 | $2,214,137 | $99.97 |
| 2023 | 22,031 | $2,245,346 | $101.92 |

120.    Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than their peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[15] |
|---|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | $843,224,007 | 10,072 | 37 60 64 65 71 | Yes - $0 | $22 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2019 | $939,399,569 | 18,674 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $25 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | $435,391,716 | 14,698 | 37 60 64 65 71 | Yes - $0 | $23 |
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2019 | $1,791,281,396 | 15,246 | 37 60 64 65 71 | Yes - $0 | $35 |

[14] The amount reported in the Auditor's Reports attached to the 401(k) Plan's Form 5500s.
[15] Unless otherwise noted, these fees are taken from the Form 5500.

32

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Great-West Life/ TIAA** | **Penn State Health 401(k) Savings Plan** | **2019** | **$1,646,231,456** | **15,020** | **64** | **Yes - $0** | **$62** |
| | | | | | | | |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2020 | $938,281,291 | 9,832 | 37 60 64 65 71 | Yes - $0 | $19 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $23 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2020 | $493,950,650 | 7,597 | 37 60 64 65 | Yes - $0 | $28 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2020 | $3,781,395,000 | 12,273 | 37 64 65 71 | No | $29 |
| Great-West | Viacom 401(k) Plan | 2020 | $1,747,213,865 | 12,469 | 15 37 50 64 | No | $37 |
| **Great-West Life/ TIAA** | **Penn State Health 401(k) Savings Plan** | **2020** | **$1,966,544,140** | **20,437** | **64** | **Yes - $0** | **$84** |
| | | | | | | | |
| Vanguard | Crowe LLP Retirement Plan | 2021 | $1,021,351,197 | 6,840 | 15 33 37 99 | Yes - $0 | $27 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37 60 64 65 71 | Yes - $0 | $28 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2021 | $693,883,632 | 14,583 | 37 60 64 65 | Yes - $0 | $5 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| Fidelity | Fortive Retirement Savings Plan | 2021 | $1,987,784,377 | 12,758 | 37, 64, 65, 71 | No | $34 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2021 | $4,285,161,000 | 12,994 | 37 64 65 71 | No | $33 |
| **Great-West Life/ TIAA** | **Penn State Health 401(k) Savings Plan** | **2021** | **$2,503,170,076** | **22,336** | **64** | **Yes - $0** | **$95** |

33

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2022 | $1,475,238,032 | 16,973 | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
| Vanguard | Crowe LLP Retirement Plan | 2022 | $992,984,046 | 7,584 | 15 33 37 99 | Yes - $0 | $26 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2022 | $1,099,817,927 | 11,787 | 37 60 64 65 71 | Yes - $0 | $30 |
| Vanguard | Vista Outdoor Inc. 401(k) Plan | 2022 | $440,444,788 | 7,295 | 15 16 33 37 38 99 | Yes - $0 | $33 |
| T. Rowe Price | Expeditors International of Washington, Inc. 401(k) Plan | 2022 | $839,061,386 | 9,597 | 15 21 25 28 37 38 49 50 52 59 62 64 65 | Yes - $0 | $31 |
| **Great-West Life/ TIAA** | **Penn State Health 401(k) Savings Plan** | **2022** | **$2,142,657,407** | **22,149** | **64** | **Yes - $0** | **$100** |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2023 | $1,837,546,518 | 18,163 | 37, 60, 64, 65, 71 | Yes - $0 | $32 |
| Fidelity | Fortive Retirement Savings Plan | 2023 | $1,915,519,824 | 13,503 | 37, 64, 65, 71 | Yes - $0 | $30 |
| **Great-West Life/ TIAA** | **Penn State Health 401(k) Savings Plan** | **2023** | **$2,572,018,199** | **22,031** | **64** | **Yes - $0** | **$102** |

121.    The above chart demonstrates that for similar plans, regarding assets and participants, the 401(k) Plan had one of the highest recordkeeping fees over the course of the Class Period.

122.    The 401(k) Plan's $89 per participant average fee from 2019 to 2023 is 224% greater than the average fee of $28 per participant from 2019 to 2023 for the twenty-two (22) plans listed above.

123.    This vast discrepancy between the 401(k) Plan's RKA fees and comparable plans existed for all years from 2019 through 2023. Indeed, the figures in the above chart are just an example of the 401(k) Plan's excessive RKA fees from 2019 through 2023.

124. The 401(k) Plan should have been able to obtain per participant recordkeeping fees of no more than $28 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

125. Further, because Great West and TIAA were parties-in-interest and received income from the funds they maintained in the 401(k) Plan, the 401(k) Plan's fiduciaries should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to Great West and TIAA.

126. Given the size of the 401(k) Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the 401(k) Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the 401(k) Plan's recordkeepers at a lower cost.

**D.    The Company Improperly Reduced its 401(k) Plan Contributions Through Forfeiture Accounts**

127. During the Class Period, Defendants breached their ERISA fiduciary duties by misusing the 401(k) Plan's assets for Defendants' own benefit and to the detriment of 401(k) Plan participants.

128. "[A]ll contributions to the Plan shall be deposited in the Trust Fund for the purposes provided in the Plan. All assets of the Plan shall be held in the Trust Fund and shall be administered in trust by the Trustee under and subject to the terms of the Plan and the Trust Agreement under which the Trust Fund is maintained from time to time." Plan Doc., at 107.

129. "Notwithstanding any contrary Plan provision, at no time shall any assets of the Plan be used for, or diverted to, purposes other than for the exclusive benefit of Employees, Participants, Beneficiaries and other persons receiving or entitled to receive benefits or payments

under the Plan and for payment of administrative or operating expenses of the Plan. Except to the limited extent permitted by paragraph 12.3 hereof, no assets of the Plan shall ever revert to or become the property of the Employers." *Id*.

130.    As alleged above, Defendants had a choice on how to utilize forfeited amounts. At the discretion of Defendants in their fiduciary capacity, forfeitures may be used to either pay the 401(k) Plan's expenses or reduce the Company's contributions to the 401(k) Plan.

131.    Using the forfeitures to reduce Company contributions is always in the best interest of Penn State because that option would decrease its own contribution costs.

132.    Absent any risk that Penn State would be unable to satisfy its contribution obligations, using forfeitures to pay 401(k) Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses.

133.    In deciding between using forfeitures to benefit the Company or using forfeitures to benefit the participants, Defendants are presented with a conflict of interest in administering the 401(k) Plan and managing and disposing of the 401(k) Plan assets.

134.    Despite the conflict of interest presented by this decision, Defendants failed to undertake any investigation into which option was in the best interest of the 401(k) Plan's participants and beneficiaries.

135.    Defendants did not, for example, investigate whether there was a risk that Penn State would be unable to satisfy its contribution obligations if forfeitures were used to pay 401(k) Plan expenses, or evaluate whether there were sufficient forfeitures to eliminate the 401(k) Plan's expenses charged to participants and still offset a portion of Penn State's own contribution obligations, as a prudent person would have done.

136.    Defendants also failed to consult with an independent, non-conflicted decisionmaker to advise them in deciding upon the best course of action for allocating the forfeitures in the 401(k) Plan, as a prudent person would have done.

137.    Although ERISA requires fiduciaries to manage the 401(k) Plan's assets solely in the interest of participants and although the 401(k) Plan grants Defendants discretion to use forfeitures to pay 401(k) Plan expenses, thereby reducing or eliminating the amounts charged to participant accounts to cover such expenses, Defendants have consistently declined to use the 401(k) Plan's assets for such purpose during the putative class period.

138.    Since at least the beginning of the Class Period, Defendants have improperly used forfeited non-vested 401(k) Plan assets for the Company's own benefit to reduce future Company contributions instead of using the funds to benefit 401(k) Plan participants.

139.    According to information from the 401(k) Plan's Form 5500, the following represents the balance in the 401(k) Plan's forfeiture accounts during the Class Period, the amount of the forfeiture improperly used to offset the Company's contributions to the 401(k) Plan, and the amounts used to pay for Plan administration costs:

| Plan Year | Forfeiture Amount | Offset Company Contributions | Offset 401(k) Plan Expenses |
|---|---|---|---|
| 2019 | $301,268 | $729,728 | $0 |
| 2020 | $637,277 | $916,100 | $0 |
| 2021 | $1,099,951 | $4,215,298 | $0 |
| 2022 | $669,411 | $3,370,426 | $0 |
| 2023 | $348,179 | $2,682,110 | $0 |
| **TOTAL** | **$3,056,086** | **$11,913,662** | **$0** |

140.    Based on the above table, from the beginning of the Class Period through 2023, almost $12 million was improperly steered from paying 401(k) Plan administrative expenses and instead used to benefit the Company.

141.    For each year during the Class Period, Penn State had sufficient cash and equivalents on hand to satisfy its contribution obligations to the 401(k) Plan. Nevertheless, throughout the Class Period, Defendants consistently based the decision of how to allocate forfeitures solely on Penn State's own self-interests and failed to consider the interests of the 401(k) Plan and its participants.

142.    Defendants effectively placed their own interests above the interests of the 401(k) Plan and its participants and caused harm to the 401(k) Plan and its participants by reducing 401(k) Plan assets, not allocating forfeited funds to 401(k) Plan participants' accounts, and also caused 401(k) Plan participants to incur at least $11.9 million in expenses that could otherwise have been covered in whole or in part by forfeited funds.

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (Against Committee Defendants)

143.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

144.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

145.    As fiduciaries of the Plans, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent

person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

146. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the interest of Plans' participants. Instead, the Prudence Defendants selected and retained investment options in the Plans despite poor performance in relation to other comparable investments.

147. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and Plans' participants would have had more money available to them for their retirement.

148. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in his Prayer for Relief.

149. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
### Breach of Fiduciary Duty of Loyalty
### (Asserted against the Company, the Committee and Board Defendants)

150. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

151.    At all relevant times, the Company, the Committee Defendants, and the Board Defendants ("Loyalty Defendants") were fiduciaries of the 401(k) Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the 401(k) Plan or disposition of the 401(k) Plan's assets.

152.    As fiduciaries of the 401(k) Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

153.    The Loyalty Defendants were required to discharge their duties to the 401(k) Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the 401(k) Plan.

154.    The Loyalty Defendants failed to exercise their duty of loyalty to the 401(k) Plan and its participants by utilizing forfeited funds in the 401(k) Plan for the benefit of the Company instead of the sole interest of the 401(k) Plan participants and beneficiaries.

155.    The Loyalty Defendants used these 401(k) Plan assets for the purpose of reducing the Company's own contributions to the 401(k) Plan, thereby saving the Company millions of dollars each year at the expense of the 401(k) Plan which received decreased Company contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

156.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the 401(k) Plan suffered millions of dollars in losses.

157.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the 401(k) Plan all losses caused by their breaches of fiduciary duties, and also must

restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in his Prayer for Relief.

158.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### Breach of ERISA's Anti-Inurement Provision
### (Asserted against the Company and the Board Defendants)

159.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

160.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

161.    Because all forfeited 401(k) Plan participant funds are initially placed in the 401(k) Plan's trust, these forfeited funds are 401(k) Plan assets.

162.    The Company's use of the forfeited funds to defray its own contributions to the 401(k) Plan in order to save itself millions of dollars in funds that the Company would otherwise have to contribute to the 401(k) Plan, caused the assets of the 401(k) Plan to inure to the benefit of the Company in violation of 29 U.S.C. § 1103(c)(1).

163.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the 401(k) Plan all losses caused by their breaches of ERISA's anti-inurement provision, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

164.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT IV**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Company and the Board)**

165.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

166.    Penn State and the Board, and its members (the "Monitoring Defendants"), had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plans.

167.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Committee Defendants were not fulfilling those duties.

168.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly to the Monitoring Defendants.

169.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

    (a)    failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plans suffered

42

significant losses as a result of the Committee Defendants' imprudent actions; and

(b)     failing to remove Committee members whose performance were inadequate, all to the detriment of the Plans and Plans' participants' retirement savings.

170.    As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

171.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plans all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in his Prayer for Relief.

**COUNT V**
**Prohibited Transactions**
**(Against All Defendants)**

172.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

173.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

174.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;"

(C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

175.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

176.    Defendants' decision to agree to pay excessive fees to Great West and TIAA as recordkeepers for the 401(k) Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

177.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the 401(k) Plan, are liable to restore to the 401(k) Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: June 27, 2025                          Respectfully submitted,

*/s/ Daniel K. Natirboff*

Daniel K. Natirboff, Esquire
PA. Atty. ID 78594
**CAPOZZI ADLER, P.C.**
2933 North Front Street
Harrisburg, PA  17110
Email: dann@capozziadler.com
Tel.: (717) 233-4101
Fax: (717) 232-3080

Mark K. Gyandoh, Esquire
James A. Maro, Esquire
(*Admission Pending*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
        jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

*Counsel for Plaintiff and the Putative Class*