**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES MULDOON,<br><br>Plaintiff,<br>v.<br><br>PENN STATE HEALTH, et al.,<br><br>Defendants. | CIVIL ACTION NO. 1:25-CV-01181<br><br>(MEHALCHICK, J.) |

# MEMORANDUM

Plaintiff James Muldoon ("Muldoon") initiated this action by filing a complaint individually, on behalf of all similarly situated individuals, on behalf of the Penn State Health 401(k) Savings Plan (the "401(k) Plan"), and on behalf of the Penn State Health Tax Sheltered Annuity Program (the "403(b) Plan") against Defendants Penn State Health, the Board of Directors of Penn State Health (the "Board"), and the Penn State Health Retirement Management Committee (the "Committee") (collectively, "Defendants"). (Doc. 1). Before the Court is Defendants' motion to dismiss.[1] (Doc. 12). For the following reasons, Defendants' motion is **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND AND PROCEDURAL HISTORY

The following background is taken from the complaint and, for the purposes of the instant motion, taken as true. (Doc. 1). Penn State Health is an academic health system serving patients and communities across fifteen central Pennsylvania counties. (Doc. 1, ¶ 32). Penn State Health administers the 401(k) Plan and the 403(b) Plan (together, the "Plans").

[1] In addition to the parties' briefing on the motion to dismiss, the Court also considers the amicus brief filed on behalf of Stable Value Investment Association ("SVIA") (Doc. 19-2).

(Doc. 1, ¶ 32). The Plans are retirement savings plans Penn State Health employees may participate in. (Doc. 1, ¶¶ 2, 50, 6-67). The Board has the authority to appoint a person or committee to administer the Plans. (Doc. 1, ¶¶ 36-39). The Board tasked the Committee with administering the Plans. (Doc. 1, ¶¶ 39-42). Muldoon is a former employee of Penn State Health who participated in the 403(b) Plan. (Doc. 1, ¶ 27).

"The 401(k) Plan is a defined contribution pension plan intended to qualify as a profit sharing plan with a qualified cash or deferral arrangement under sections 401(a), 401(k) and 402A of the Internal Revenue Code of 1986." (Doc. 1, ¶ 50). The 403(b) Plan "permits eligible employees to make annual contributions [to a retirement savings plan] of up to 100 percent of eligible compensation through a salary deferral election." (Doc. 1, ¶¶ 2, 66-67). Defendants contracted with Great-West Life & Annuity Insurance Co. ("Great West") to invest in Great West's General Investment Contract ("GIC"). (Doc. 1, ¶¶ 15, 17). "For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs." (Doc. 1, ¶ 87). "GICs are issued by insurance companies in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or 'crediting rate' during a specified period." (Doc. 1, ¶ 88). Certain GICs, such as the Great West GIC, are riskier than other investment funds because "the funds are held unrestricted in the general account of the insurance carrier" and this make them "more vulnerable to single entity credit risk." (Doc. 1, ¶ 91). In other words, risky funds, such as the Great West GIC, "are generally subject to claims and liabilities asserted against the insurer" and "the insurer is the sole entity responsible for paying such funds." (Doc. 1, ¶ 92).

Defendants controlled the Plans, and although less risky GIC options were available than the Great West GIC, Defendants selected the Great West GIC over other GIC options with higher credit ratings and lower spreads. (Doc. 1, ¶¶ 93-98). Alternative GICs significantly outperformed the Great West GIC between 2019 and 2023. (Doc. 1, ¶¶ 99-104). Defendants also entered a recordkeeping and administration fees agreement ("RKA") with Great West and TIAA, another GIC provider, even though Great West and TIAA had GICs in the Plans and indirectly made money off the Plans' investment in their GICs. (Doc. 1, ¶¶ 105-07). Great West charged the Plans significantly higher record keeping fees than other record keeping service providers even though record keeping administration is a relatively simple task and the general economic trend is to pay less for record keeping. (Doc. 1, ¶¶ 108-26).

According to Muldoon, Defendants had discretionary authority to take forfeitures from employee contributions to the Plans and use those forfeitures to either pay the Plans' expenses or to offset Penn State Health's own contributions to the Plans. (Doc. 1, ¶¶ 127-31). Defendants frequently used the forfeitures to reduce Penn State Health's contributions, resulting in nearly Defendants saving  nearly twelve million dollars in contributions Penn State Health would otherwise have to pay to the Plans. (Doc. 1, ¶¶ 127-42). Defendants took no steps to account for their own conflict of interest or consult with an independent, non-conflicted decision maker who did not stand to save millions of dollars. (Doc. 1, ¶¶ 131-36).

Muldoon alleges five counts under the Employee Retirement Income Security Act of 1974 ("ERISA"). (Doc. 1). In Count I, Muldoon alleges that the Committee is liable under ERISA for breach of the fiduciary duty of prudence. (Doc. 1, ¶¶ 143-49). In Count II, Muldoon alleges that Defendants are liable under ERISA for breach of fiduciary duty of loyalty. (Doc. 1, ¶¶ 150-58). In Count III, Muldoon alleges Penn State Health and the Board

are liable for breach of ERISA's anti-inurement provision. (Doc. 1, ¶¶ 159-64). In Count IV, Muldoon alleges that Penn State Health and the Board are liable under ERISA for failure to adequately monitor other fiduciaries. (Doc. 1, ¶¶ 165-71). In Count V, Muldoon alleges that Defendants are liable for engaging in transactions prohibited by ERISA. (Doc. 1, ¶¶ 172-77).

## II. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions that are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the required elements that make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions'. . . "

*Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). Nor need a court assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

## III. Discussion

Defendants submit that the Court must dismiss this action because Muldoon lacks Article III standing and because he fails to state a claim. (Doc. 13, at 18-50).

### A. Standing

Defendants aver that Muldoon does not have standing to assert a claim because he previously entered a severance agreement (the "Agreement") when he left Penn State Health's

employment "in which he promised not to bring the very kind of lawsuit he has filed here." (Doc. 13, at 18-22). Muldoon counters that while he signed the Agreement, it does not cover the causes of action in dispute here. (Doc. 22, at 15-18).

Where a plaintiff lacks standing, the Court lacks subject matter jurisdiction to hear their claims. *See Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (stating "[a]bsent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed"). However, Defendants' standing argument relies on the Agreement, which is evidence outside of the complaint. (Doc. 13, at 18-22; Doc. 13-4). Given the procedural posture of this matter, the Court must first assess whether it can consider the Agreement.

"The general rule . . . is that 'a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.'" *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 97 (3d Cir. 2010) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). However, "courts may consider 'document[s] integral to or explicitly relied upon in the complaint,' or any 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016) (citations omitted). A court may also consider undisputably authentic evidence outside of the complaint where the evidence shows that the Court lacks subject matter jurisdiction. *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000), *holding modified by Simon v. United States*, 341 F.3d 193 (3d Cir. 2003) (stating "[i]n reviewing a factual attack [to subject matter jurisdiction], the court may consider evidence outside the pleadings"); *see also Froshour v. Home Repair, LLC*, No. 22-CV-0276-JMY, 2022 WL 23023948, at *1 (E.D. Pa. Sept. 1, 2022)

(stating "[t]he district court is not required to convert a motion to dismiss for lack of subject matter jurisdiction into a motion for summary judgment merely because the court considers evidence outside the complaint"); *see also* *Gonzalez v. JPMorgan Chase Bank, NA*, No. 2:25-CV-01889, 2025 WL 2458344, at *1 (D.N.J. Aug. 26, 2025) (considering an undisputably authentic agreement in which the plaintiff agreed not to bring ERISA claims). Here, Muldoon does not challenge the authenticity or validity of the Agreement, but rather, argues that it does not preclude his claims. (Doc. 22, at 15-18). Accordingly, the Court will consider the Agreement. (Doc. 13-4).

Parties may generally enter release agreements which prohibit the parties from bringing certain kinds of claims. *See* *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 892 (3d Cir. 1975) (stating "[a] signed release is binding upon the parties unless executed and procured by fraud, duress, accident or mutual mistake"); *see also* *Bowersox Truck Sales & Serv., Inc. v. Harco Nat. Ins. Co.*, 209 F.3d 273, 279 (3d Cir. 2000) (stating the same). EIRSA provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under [ERISA] shall be void as against public policy." 29 U.S.C.A. § 1110(a). The Third Circuit has held, however, that this provision does not automatically void all release agreements as applied to ERISA claims. *See* *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 594 (3d Cir. 2009). Rather, the provision "extend[s] only to contractual or other devices that purport to alter the statutory obligations of a fiduciary under ERISA, and [does] not to reach a release of claims signed by an individual claiming the breach of a fiduciary duty" or other individual ERISA claims. *Schering Plough Corp.*, 589 F.3d at 594. Release agreements which pertain to a plaintiff's individual ability to bring direct ERISA claims are permissible, but release agreements which

seek to prevent derivative actions, meaning actions brought on behalf of a retirement plan itself, are not. *See Schering Plough Corp.*, 589 F.3d at 594, 559-60 (reversing a district court's finding that a release agreement could not be enforced regarding ERSA claims, noting that the plaintiff can still bring derivative claims despite the release agreement, and remanding the case); *see also Moore v. Comcast Corp.*, 268 F.R.D. 530, 535 (E.D. Pa. 2010) (stating "an individual release of ERISA claims, signed by an employee, is valid and not barred by the language of § 410(a)"); *see also Gonzalez*, 2025 WL 2458344, at *3 (granting a motion to dismiss because the plaintiff agreed not to bring ERISA claims against his former employer).

When applying release agreements relating to ERISA claims, courts apply the general principle that "'an unambiguous agreement should be enforced according to its terms.'" *Calvitti v. Anthony & Sylvan Pools Corp.*, 351 F. App'x 651, 654 (3d Cir. 2009) (nonprecedential) (quoting *McDowell v. Philadelphia Hous. Auth. (PHA)*, 423 F.3d 233, 238 (3d Cir. 2005)); *see also Gonzalez*, 2025 WL 2458344, at *2 (noting that courts enforce the unambiguous terms of release agreements barring ERISA claims); *see also Johnston v. Indep. Blue Cross, LLC*, No. CV 19-3524, 2021 WL 765771, at *1 (E.D. Pa. Feb. 26, 2021) (stating "[b]ecause the terms of the Separation Agreement unambiguously waive [plaintiff's] remaining [ERISA] claims, the Court will grant the motion for summary judgment"). The Third Circuit has cautioned against reading release agreements too broadly and "a release covers only those matters which may fairly be said to have been within the contemplation of the parties when the release was given." *Bowersox Truck Sales & Serv., Inc.*, 209 F.3d at 279 (reversing a district court's finding that a release agreement barred the plaintiff's claims and stating that "[r]eleases are strictly construed 'so as to avoid the ever present possibility that the releasor may be overreaching'" (citing *Restifo v. McDonald*, 426 Pa. 5, 9, (1967)).

Here, Defendants provide the Agreement which Muldoon signed on February 15, 2024. (Doc. 13-4, at 10). The Agreement releases Muldoon from his employment with Penn State Health and is titled "Severance Agreement and General Release." (Doc. 13-4, at 4). In exchange for signing the agreement, Muldoon received eight weeks' pay, totaling $20,764.80. (Doc. 13-4, at 2). Section three of the Agreement has a release provision which provides the following:

> Employee and Employee's agents, successors, assigns and representatives . . . do hereby waive, release and forever discharge Employer and its affiliates, subsidiaries . . . its and their joint ventures (including its and their respective directors, officers, employees, shareholders, partners agents, benefit plans and fiduciaries thereof, in each case, past, present, and future) . . . from any and all suits, claims, demands, rights, actions or causes of action of whatever kind or nature, in law or in equity, direct or indirect, known or unknown, matured or not matured, arising from or in connection with Employee's employment with Released [Parties] or the termination of said employment, including but not limited to suits or claims under the . . . the Employee Retirement Income Security Act of 1974 ("ERISA") . . . that Employee has or could assert against Released Parties, arising from any fact or circumstance occurring up to and including the date of the execution of this Agreement, but excluding any claims which Employee may make under state workers' compensation or unemployment laws and any claims which by law Employee cannot waive. Employee [further] waives and releases any right that Employee may have to come within, or to invoke, the employee complaint procedure or the involuntary termination plan, as may be provided by any Released Party policy.

(Doc. 13-4, at 3-4).

The Agreement further provides that:

> Employee agrees that Employee, or anyone on Employee's behalf, has not, and will not initiate any charge or complaint or institute any claim, lawsuit or administrative law action against any Released Party asserting any claims released in Section 3 hereof. If Employee breaches Employee's promise in this Section and files a lawsuit or administrative law action or otherwise pursues claims that Employee has released, Employee shall pay for all costs incurred by the Released Parties, including without limitation, reasonable attorney's fees, in defending against Employee's claim and Employee shall return all compensation paid by Employer under this Agreement.

(Doc. 13-4, at 4-5).

Defendants aver that these provisions unambiguously strip Muldoon of standing in this action because he expressly agreed not to bring ERISA claims against Defendants. (Doc. 13, at 18-22). Muldoon counters that these provisions do not cover the instant action because while they may bar him from bringing exclusively individual claims, they do not bar him from bringing class action claims or claims on the Plans' behalf. (Doc. 22, at 15-18). According to Muldoon, the Agreement does not cover this action because 1) it does not have a class action waiver and 2) the Agreement may not prohibit derivative actions under ERISA. (Doc. 22, at 15-18).

Beginning with whether Muldoon can bring a class action lawsuit, the Court finds that because the Agreement unambiguously bars Muldoon from bringing individual claims, it necessarily bars him from bringing class action claims based on individual, direct causes of action. (Doc. 22, at 15-18). To bring a class action lawsuit based on direct claims and serve as a class representative, a plaintiff must themselves be able to bring a direct claim representative of the claims of the suit's purported class members. *See Monaco v. Mitsubishi Motors Credit of Am., Inc.*, 34 F. App'x 43, 45 (3d Cir. 2002) (nonprecedential) (stating "[i]t is well settled that 'to be a class representative on a particular claim, the plaintiff himself must have a cause of action on that claim'" (quoting *Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1169 (3d Cir. 1987)); *see also U.S. ex rel. Krahling v. Merck & Co.*, 44 F. Supp. 3d 581, 601 (E.D. Pa. 2014) (stating the same and noting that "Third Circuit precedent . . . holds that a named plaintiff must establish proper standing to bring each claim before class certification"); *see also Clark v. McDonald's Corp.*, 213 F.R.D. 198, 221 n.18 (D.N.J. 2003) (finding that a plaintiff cannot serve as a class representative for a claim where the plaintiff lacked standing to bring that claim). Thus, if the Agreement bars Muldoon from bringing individual, direct claims, he cannot bring

class action claims based on individual, direct causes of action. *See Monaco*, 34 F. App'x at 45; *see also Krahling*, 44 F. Supp. 3d at 601; *see also Clark v. McDonald's Corp.*, 213 F.R.D. at 221 n.18.

The Agreement waives liability "from any and all suits, claims, demands, rights, actions or causes of action of whatever kind or nature. . . arising from or in connection with [Muldoon's] employment with [Defendants] or the termination of said employment, including but not limited to suits or claims under . . . ERISA." (Doc. 13-4, at 3-4). The Agreement further states that Muldoon or "anyone on [Muldoon's behalf] . . . will not initiate any . . . claim [or] lawsuit . . . against any Released Party" for any claims the Agreement waived liability for. (Doc. 13-4, at 4). Thus, the Agreement specifically provides that Muldoon may not bring ERISA claims against Defendants, and all of Muldoon's claims are ERISA claims. (Doc. 1, ¶¶ 143-77; Doc. 13-4, at 3-4).

However, even though the Agreement unambiguously bars Muldoon from bringing individual, direct claims, ERISA limits release agreements' ability to protect defendants from derivative claims. *See* 29 U.S.C.A. § 1110(a). Muldoon avers that the Agreement may not prevent him from bringing derivative claims on behalf of the Plans. (Doc. 22, at 17-18). Defendants argue that in *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 594-95, 599-60 (3d Cir. 2009), the Third Circuit held that a release agreement may bar derivative claims because an "individual plaintiffs may agree not to sue on a plan's behalf." (Doc. 24, at 8).

While the Third Circuit held that a release agreement can bar a plaintiff from bringing individual claims, it also held that a complaint framed purely as a derivative action may not be barred by a release agreement. *Schering Plough Corp.*, 589 F.3d at 594. The Third Circuit found that the plaintiff's valid release agreement barring her from bringing individual claims

did not bar the complaint because the "complaint frame[d] [the plaintiff's] causes of action in terms of claims brought 'on behalf of' the Plan. Nowhere [did the plaintiff] present the claims as anything but causes of action that belong to the Plan and are based on duties owed to the Plan." *Schering Plough Corp.*, 589 F.3d at 594. Elsewhere in the Third Circuit's decision, while evaluating a district court's denial of class certification, the court noted that the plaintiff's release agreement could bar her from serving as a class representative in a class action claim because the agreement could bar her from receiving any compensation. *Schering Plough Corp.*, 589 F.3d at 594, 559-600. However, the Third Circuit found that the release agreement did not bar the plaintiff's purely derivative claims and the issue of class certification was not properly before the Court. *Schering Plough Corp.*, 589 F.3d at 594, 559-600.

Although this Court disagrees with Defendants' reading of *Schering Plough Corp.*, it also does not find that *Schering Plough Corp*. clearly applies to save the entire instant complaint. The decision *Schering Plough Corp*. concluded that the plaintiff's claims survived the release agreement because the complaint framed its causes of action purely as derivative and "[n]owhere" did the plaintiff assert their claims as anything other than derivative. *Schering Plough Corp.*, 589 F.3d at 594. That is not the case here. Muldoon explicitly brings individual claims. In the complaint, Muldoon states that he "brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure *on behalf of himself* and the . . . proposed class." (Doc. 1, ¶ 43) (emphasis added). To the extent that Muldoon brings individual claims, Defendants' motion to dismiss (Doc. 12) is **GRANTED**, and Muldoon's individual claims are **DISMISSED**.

However, Muldoon states in a footnote that he brings his claims derivatively in the alternative to class certification. (Doc. 1, at 11 n. 6). Muldoon also states that he seeks relief

on behalf of the Plans. *See* (Doc. 1, at 45) (requesting "[a]ctual damages in the amount of any losses the Plans suffered"). Further, Muldoon brings his claims pursuant to ERISA § 502(a)(2), found at 29 U.S.C. § 1132 (a)(2). (Doc. 1, ¶¶ 148, 157, 163, 171, 177). In *Schering Plough Corp.*, while determining that the plaintiff's release agreement did not bar her derivative claims, the Third Circuit noted that claims brought pursuant to ERISA § 502(a)(2)/29 U.S.C. § 1132(a)(2) are inherently derivative and that "the vast majority of courts have concluded that an individual release has no effect on an individual's ability to bring a claim on behalf of an ERISA plan under § 502(a)(2)." 589 F.3d at 594. Thus, the Court will not dismiss Muldoon's derivative ERISA § 502(a)(2)/29 U.S.C. § 1132(a)(2) claims based on the Agreement at this time. Accordingly, the Court must consider whether Muldoon states a claim as a derivative cause of action.

B. BREACH OF DUTY OF LOYALTY AND ANTI-INUREMENT

In Count II, Muldoon alleges that Defendants breached their duty of loyalty by taking excessive funds from Muldoon and other participants' contributions as forfeitures in order to reduce the amount of contributions Penn State Health was required to pay to the Plans. (Doc. 1, ¶¶ 150-58). In Count III, Muldoon alleges that Penn State Health and the Board violated ERISA's anti-inurement provision by using forfeited funds for their own benefit. (Doc. 1, ¶¶ 159-64). Defendants argue that the Court should dismiss Count II because "when plan documents permit the use of forfeited funds to pay either plan contributions or plan expenses, ERISA does not require one option over the other." (Doc. 13, at 23). According to Defendants, Count II fails because 1) Muldoon cannot bring a breach of loyalty claim to recover funds he never had a right to under the plan, 2) Muldoon's claims require the Court to adopt an impermissible categorical rule regarding how Defendants must use forfeited

funds, 3) Muldoon seeks to hold Defendants to a higher standard than what the Plans' documents require, 4) long standing practice allows retirement plan administrators to collect forfeitures, and 5) Muldoon's theory of the duty of loyalty would lead to absurd results where plan documents must forbid plan administrators from using forfeitures to pay for plan expenses if the plan administrators want to have the option to use forfeitures to offset contributions. (Doc. 13, at 22-27). Similarly, Defendants argue that Muldoon cannot state an anti-inurement claim because the forfeited funds were paid directly into the Plans and Defendants acted entirely within their discretion by opting to use forfeitures to offset contributions rather than pay expenses. (Doc. 13, at 27-29). Muldoon counters that Defendants mischaracterize his breach of loyalty claims. (Doc. 22, at 35-38). According to Muldoon, he is not arguing that Defendants cannot use forfeiture to offset contributions; rather, he argues that Defendants acted in a self-interested manner in determining how much to allocate from forfeiture funds without taking steps to ensure Defendants' conflicts of interest were accounted for in their decision-making process. (Doc. 22, at 35-38). Regarding his anti-inurement claims, Muldoon contends that he states an anti-inurement claim because he alleges that Penn State Health and the Board used the forfeitures to benefit themselves by offsetting their own contributions. (Doc. 22, at 39).

Beginning with Muldoon's duty of loyalty claims, under ERISA, a plan fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). ERISA requires "that fiduciaries act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].'" *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421, (2014) (quoting 29 U.S.C. § 1104(a)(1)(D)). A fiduciary may

be liable for breach of the duty of loyalty under ERISA. *See Eckert v. Chauffeurs, Teamsters & Helpers Loc. Union 776 Profit Sharing Plan*, 306 F. Supp. 3d 659, 669 (M.D. Pa. 2018) (stating "ERISA requires a plan fiduciary to not 'deal with the assets of the plan in his own interest or for his own account.' The duties described under Sections 1104 and 1106 of ERISA can be described as a fiduciary's duty of loyalty" (citations omitted)). The duty of loyalty prohibits fiduciaries from acting for their own benefit and a plaintiff can bring a breach duty of loyalty claim even if no loss occurs. *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 415 (3d Cir. 2013) (stating "ERISA's duty of loyalty bars a fiduciary from profiting even if no loss to the plan occurs"); *see also Nicolas v. Trs. of Princeton Univ.*, No. CV 17-3695, 2017 WL 4455897, at *3 (D.N.J. Sept. 25, 2017) (stating "the duty of loyalty requires a plan fiduciary to 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan'" (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570-71 (1985)). However, a breach of duty of loyalty claim is distinct from a breach of duty of prudence claim, and breach of loyalty claims are subject to dismissal where the plaintiff alleges only that the defendant acted imprudently. *See Grink v. Virtua Health, Inc.*, 812 F. Supp. 3d 434, 451 (D.N.J. 2025) (dismissing a breach of the duty of loyalty claim where the complaint only contained "allegations of imprudent conduct" and contained no allegations that the defendants "acted improperly to benefit themselves or any third parties"); *see also Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 2:20-CV-01493-CCW, 2021 WL 3417843, at *5 (W.D. Pa. Aug. 3, 2021) (stating "a complaint must allege something more than just imprudence or mismanagement to state a viable claim for an ERISA fiduciary's breach of the duty of loyalty"). Nonetheless, breach of

loyalty claims often turn on factual determinations regarding whether a fiduciary put their own interests above that of a retirement plan and a court must accept allegations of self-dealing as true at the pleadings stage. *See Chrupcala on behalf of Firstrust 401(k) & Profit Sharing Plan v. Firstrust Sav. Bank*, 828 F. Supp. 3d 563, 573 (E.D. Pa. 2026) (rejecting a defendant's arguments that a plaintiff's allegations of self-dealing were too speculative because the complaint clearly alleged that the defendant acted for their own benefit and discovery was required for defendant's to disprove such allegations); *see In re Cigna ERISA Litig.*, No. 25-CV-2465-JMY, 2026 WL 1398620, at *5 (E.D. Pa. May 19, 2026) (rejecting a motion to dismiss based on a defendant's factual assertions that they complied with the plans' requirements and did not act for their own self-interest).

Relatedly, under ERISA's anti-inurement provision, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). "The purpose of the anti-inurement provision, in common with ERISA's other fiduciary responsibility provisions, is to apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 23 (2004). The question posed in anti-inurement disputes is whether a defendant used funds for "the sole purpose of paying pension benefits to Plan participants" or to inure (meaning direct) funds for their own benefit. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 442 (1999).

Defendants' arguments regarding Muldoon's breach of duty of loyalty claims are premised on Defendants' assertion that Muldoon's breach of loyalty claims involve Muldoon

asserting that "ERISA itself overrides the discretion afforded by the Plan and requires the Committee to use forfeited funds to pay plan expenses." (Doc. 13, at 22). Defendants cite a variety of nonprecedential cases from outside the Third Circuit and from the District of New Jersey which held that ERISA does not require fiduciaries "to use the forfeitures to pay administrative costs." *Fumich v. Novo Nordisk Inc.*, No. CV 24-9158, 2025 WL 2399134, at *7 (D.N.J. Aug. 19, 2025); *see also Cain v. Siemens Corp.*, No. CV 24-8730, 2025 WL 2172684, at *5 (D.N.J. July 31, 2025) (rejecting a plaintiff's argument that "a fiduciary would always be required to use Forfeitures to pay administrative costs even if the plan document gave it the option to reallocate those funds to reduce employer contributions"). Similarly, Defendants' arguments regarding Muldoon's anti-inurement claims are premised on the notion that Muldoon alleges that Defendants' practice of using forfeitures to offset contributions rather than pay expenses violates ERISA in general. (Doc. 13, at 27-28). However, Defendants' arguments do not accurately reflect Muldoon's claims.

In the complaint, Muldoon agrees with Defendants that the Plans' agreements allowed Defendants to collect forfeitures and use those forfeitures, at their discretion, to either pay the Plans' expenses or reduce offset company contributions. (Doc. 1, ¶ 130). Muldoon does not allege that the existence of this discretion is itself a violation of ERISA, but rather, that Defendants violated ERISA's duty of loyalty and anti-inurement provisions by exercising this discretion to benefit itself, rather than the Plans. (Doc. 1, ¶¶ 127-42, 154-55, 162). According to the complaint, Defendants took no steps to consult with an independent decision maker or otherwise account for their conflict of interest and *purposefully* used their discretionary authority to save themselves millions of dollars. (Doc. 1, ¶¶ 131-36. 154-55, 162). While characterizing Muldoon's breach of loyalty claims, Defendants quote a portion of the

complaint which, read in its entirety, states "[a]bsent any risk that Penn State would be unable to satisfy its contribution obligations, using forfeitures to pay 401(k) Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses." (Doc. 1, ¶ 132; Doc. 13, at 25). Defendants characterize this statement as an assertion that "the duty of loyalty *always* requires using forfeited funds to pay plan expenses, unless an employer 'would [otherwise] be unable to satisfy its contribution obligations.'" (Doc. 13, at 25) (emphasis in original). However, read in full, the statement merely alleges the existence of a conflict of interest in which Defendants have an incentive to contribute less money to the Plans. (Doc. 1, ¶ 132).

The existence of a conflict of interest by itself does not create a breach of a duty of loyalty or of ERISA's anti-inurement provisions. *See Johnson v*, 2021 WL 3417843, at *5 (noting that to state a claim for breach of a duty of loyalty the plaintiff must do more than allege a conflict of interest). However, Muldoon's claims are not premised solely on the existence of a conflict of interest. Rather, Muldoon alleges that 1) Defendants had an conflict of interest because they stood to save millions of dollars by limiting the contributions Penn State Health paid to the Plans, 2) Defendants made no effort to account for that conflict of interest when making decisions, 3) Defendants abused their discretionary authority by using their discretion for the purpose of saving millions, and 4) Defendants acted at the expense of the Plans because their self-interested actions reduced the amount of money paid to the Plans by nearly twelve million dollars. (Doc. 1, ¶¶ 127-42, 154-55).

While ERISA does not prohibit discretionary authority, it does prohibit defendants from using that authority for the purpose of serving their own interests and benefiting themselves. *See* 29 U.S.C. § 1104 (a)(1) (noting that a fiduciary must only act at the interest of

retirement plans); *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. at 442 (noting that ERISA's anti-Inurement requires plan funds to be used for "the sole purpose of paying pension benefits to Plan participants"); *see also Fifth Third Bancorp*, 573 U.S. at 421(noting that an agreement cannot contract away a fiduciary's duties). While additional discovery may disprove Muldoon's allegations of purposeful, self-interested abuses of discretion, at the pleadings stage, the Court cannot make factual determinations regarding whether Defendants acted in their own self-interest and the Court is bound by the allegations in the complaint. *See Chrupcala*, 828 F. Supp. 3d at 573 (noting that the Court cannot contradict allegations regarding an alleged breach of duty of loyalty prior to discovery); *see In re Cigna ERISA Litig.*, 2026 WL 1398620, at *5 (noting the same and denying a motion to dismiss breach of loyalty and anti-inurement claims). At this early stage the Court must accept as true that Defendants acted explicitly in their own self-interest and saved millions of dollars by doing so. (Doc. 1, ¶¶ 127-42, 154-55, 162). Accordingly, the Court **DENIES** Defendants' motion to dismiss Counts II and III. (Doc. 12). However, the Court's denial is **without prejudice** to Defendants' ability to raise the same issues on summary judgment.

C. Duty of Prudence and Prohibited Transactions

In Count I, Muldoon alleges that the Committee breached the duty of prudence because it did not "make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the interest of Plans' participants. Instead, the [the Committee] selected and retained investment options in the Plans despite poor performance in relation to other comparable investments." (Doc. 1, ¶¶ 143-149). Specifically, Muldoon alleges that the Committee's investment in the Great West GIC breached the duty of prudence because the Great West GIC underperformed relative to other GICs, Defendants did not

properly monitor the Great West GIC's performance, and Defendants allowed the Plans to lose substantial value by continuing to invest in the Great West GIC while also overpaying Great West for record keeping services. (Doc. 1, ¶¶ 93-107). Relatedly, in Count V, Muldoon alleges that Defendants engaged in prohibited transactions by paying excessive record keeping fees to Great West. (Doc. 1, ¶¶ 172-177).

Defendants aver that the Court must dismiss Count I because 1) Muldoon challenges the Great West GIC's inclusion in both the 401(k) Plan and the 403(b) plan when he only participated in the 403(b) plan and 2) Muldoon's allegations that the Great West GIC underperformed are insufficient to state a claim for breach of the duty of prudence because he fails to allege that comparator investments substantially similar to the Great West GIC performed better or allege any deficiencies in the Committee's decision making process. (Doc. 13, at 34-44). Regarding Count V, Defendants contend that Muldoon fails to state a claim for ERISA prohibited transactions because there are no allegations suggesting Defendants' retention of Great West for fee keeping services was unreasonable. (Doc. 13, at 44-50). Muldoon counters that he has standing to sue on behalf of both of the Plans even though he only participated in one because of the class action and derivative nature of the complaint. (Doc. 22, at 18-19). On the substance of his claims, Muldoon argues that his allegations of carelessness, poor decision making, underperformance, and overpayment are sufficient to state a claim for both breach of duty of prudence and improper transactions. (Doc. 22, at 18-33).

Beginning with Defendants' arguments that Muldoon cannot assert claims regarding Defendants' management of the 401(k) Plan, as discussed *supra* Section III.A, Muldoon may only bring this action derivatively on behalf of the Plans. Courts in the Third Circuit have

found that where a plaintiff brings ERISA derivative and/or class action claims against the administrators of an employee savings program, that plaintiff may bring derivative and/or class action claims regarding the defendant's administration of the entire savings program even if the claims implicate specific retirement plan options the plaintiff themselves did not personally participate in. *See Mulder v. PCS Health Sys.*, Inc., 216 F.R.D. 307, 317 (D.N.J. 2003); *see also Dann v. Lincoln Nat. Corp.*, 708 F. Supp. 2d 481, 487 (E.D. Pa. 2010); *see also In re Merck & Co., Inc., Sec. Deritative & Erisa Litig.*, No. CIV.A. 05-2369, 2006 WL 2050577, at *8 (D.N.J. July 11, 2006). A plaintiff may do so as long as "the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans." *See Mulder*, 216 F.R.D. at 317 (D.N.J. 2003) (citing *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422 (6th Cir. 1998)). Here, Muldoon can bring a challenge on behalf of both of the Plans even though he only participated in the 403(b) Plan because he is challenging the exact same practices which allegedly harmed both the Plans: Defendants' choosing the Great West GIC over other GICs and overpaying Great West for administrative services. (Doc. 1, ¶¶ 93-104).

Turning to the substance of Muldoon's breach of the duty of prudence claim, ERISA requires fiduciaries to administer retirement plans "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "To plead a breach of the duty of prudence under ERISA, then, a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness." *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 184 (3d Cir. 2024). "This standard is objective, focusing not on investment results but on process—that is, whether the facts, assessed holistically, permit a reasonable inference that a fiduciary's decision-making

process was deficient. That process must be judged 'under the circumstances then prevailing,' not in hindsight." *Grink*, 812 F. Supp. 3d at 451 (citations omitted).

It is insufficient for a plaintiff to merely allege that a plan's investment underperformed relative to other investment options. *See Grink*, 812 F. Supp. 3d at 454. However, courts must recognize that prior to discovery, a plaintiff may not be able to present perfect comparators, and courts must accept as true all allegations regarding deficiencies in the defendant's decision making process and the shortcoming of the defendant's choices. *See Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 188 (3d Cir. 2024) (reversing a district court's dismissal of a breach of duty of prudence claims because while the plaintiff's proposed comparisons to other plans were "not perfect," the plaintiff sufficiently alleged that the defendants' decisions while administering a plan led to the plan paying significantly higher fees than other plans); *see also Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 511 (D.N.J. 2021) (denying a motion to dismiss because the court had to accept the complaint's allegations as true that 1) the defendants selected underperforming investment options without properly analyzing the investment options' performances and 2) the defendants failed to properly monitor record keeping fees, which led to the plans significantly over paying).

Relatedly, ERISA's prohibitions on certain transactions found at 29 U.S.C. § 1106(a) prohibit "fiduciaries from (1) 'caus[ing a] plan to engage in a transaction' (2) that the fiduciary 'knows or should know . . . constitutes a direct or indirect ... furnishing of goods, services, or facilities' (3) 'between the plan and a party in interest.' . . . Any transaction that satisfies its three elements is presumptively unlawful." *Cunningham v. Cornell Univ.*, 604 U.S. 693, 700

(2025) (citations omitted). A party in interest includes any "person[2] providing services to [an employee] plan." 29 U.S.C.A. § 1002 (14) (B). A defendant is not liable for engaging in a transaction with an interested party where 1) the transaction serves the operation of the plan, and 2) "no more than reasonable compensation is paid therefor."[3] 29 U.S.C. § 1108(b)(2)(A).

Muldoon alleges that Defendants chose the Great West GIC even though it "had underwhelming crediting rates when compared against GICs provided by other comparable carriers for other retirement plans." (Doc. 1, ¶ 98). Muldoon further alleges that the Great

---

[2] EIRISA includes artificial entities such as corporations in its definition of "person." 29 U.S.C.A. § 1002 (9).

[3] As noted by Muldoon, Defendants' opening brief failed to discuss the Supreme Court's recent decision in *Cunningham v. Cornell Univ.*, 604 U.S. 693, 700-04 (2025). (Doc. 22, at 28-29). In *Cunningham*, the Supreme Court held that to state a claim for engagement in prohibited transactions under 29 U.S.C. § 1106(a), a plaintiff only needs to allege that a fiduciary transferred plan property to a person in interest as defined by EIRSA and that courts should not resolve questions of whether the § 1108 (b)(2)(A)'s reasonableness exemption applies until after the defendant files an answer with affirmative defenses. 604 U.S. at 700-04. Defendants do not contest that Great West is a party in interest since it provided the Plans with its GIC. (Doc. 1, ¶¶ 107, 176). The complaint alleges that Defendants transferred property to Great West in the form of payments. (Doc. 1, ¶¶ 107, 176). Muldoon also alleges that Defendants paid TIAA, another GIC provider, record keeping fees after investing in TIAA's GIC. (Doc. 1, ¶¶ 105-07). Under the Supreme Court's *Cunningham* decision, it appears that these allegations are sufficient to state a claim. 604 U.S. at 700. However, in their reply brief, Defendants argue that *Cunningham* does not overturn long standing Third Circuit precedent that a court may dismiss an action based on an affirmative defense that "appears on its face" and there are no allegations that Defendants acted unreasonably in the complaint. (Doc. 24, at 24-25). The Court need not decide whether *Cunningham* conflicts with such precedent because the Court finds, for the reasons discussed above, that Muldoon alleges unreasonable behavior, so the reasonableness affirmative defense does not appear on its face. The complaint's allegations of unreasonable behavior involve allegations incorporated and alleged in both Counts I and V because both counts allege that Defendants' dealings with Great West were unreasonable and imprudent. (Doc. 1, ¶¶ 93-149, 172-77). Defendants also argue that Muldoon's allegations regarding Great West's fees are insufficient for the same reasons under a duty of prudence theory and under a prohibited transactions theory. (Doc. 13, at 44-50). Thus, the Court will discuss Count I and V's allegations of unreasonable behavior together.

West GIC underperformed the comparator funds by "an average of over 56%." (Doc. 1, ¶ 99). Muldoon alleges that not only did Defendants act imprudently when choosing Great West's underperforming GIC, but Defendants also contracted with Great West for record keeping services and paid far above market rate for such services. (Doc. 1, ¶¶ 117-26).

Defendants argue that Muldoon fails to identify a comparator with sufficient similarities to Great West for the Court to determine that the Great West GIC underperformed relative to other investment options or that Great West overcharged relative to other administrative service providers. (Doc. 13, at 40-50). Similarly, SVIA's amicus brief argues that Muldoon's complaint is part of a broader trend of complaints against retirement plan administrators where plaintiffs allege that a retirement plan underperformed, list a variety of comparators, and fail to identify, with specificity, the deficiencies in the process by which the defendants made the investment choices they made or what makes the plaintiff's listed comparators valid metrics of underperformance. (Doc. 19-2, at 8-27). Both Defendants' and SVIA's arguments are, in essence, factual challenges that the Court cannot assess at this early stage. (Doc. 13, at 44-50; Doc. 19-2, at 8-27). Defendants even ask the Court to try, without the benefit of discovery or expert testimony, to determine whether the complaint employs an appropriate mathematical methodology when calculating the degree to which Great West overcharged for record keeping. (Doc. 13, at 46-47; Doc. 24, at 24). The Court finds that these challenges are premature.

The Court acknowledges that the complaint lists a variety of options for GIC investments or record keeping services Defendants could have chosen over Great West without providing substantial details about the similarities between those options and Great West. (Doc. 1, ¶¶ 98-104, 120). The Court also acknowledges that Muldoon concedes that

prior to discovery, he has limited information regarding the specifics of Defendants' decision-making process. (Doc. 1, ¶ 83). However, at this early stage, the Court must be cognizant of the limits of pre-discovery pleading and plaintiffs are not required to identify "perfect" comparators prior to discovery. *Mator*, 102 F.4th at 188. For purposes of the instant motion, the Court must accept as true that 1) Defendants chose to invest in the Great West GIC even though it posed unnecessary risks and had a poor credit rating, 2) Defendants continued to invest in Great West even though, year after year, it significantly underperformed other available GIC investment options, and 3) after Defendants invested in Great West's underperforming and low rated GIC, Defendants chose to pay Great West 224% higher than average record keeping costs. (Doc. 1, ¶¶ 19, 98-104, 107, 117-26). While discovery may show that Defendants carefully evaluated their options and acted reasonably, the allegations are sufficient for the Court to conclude that Defendants acted unreasonably when managing the Plans. *See Mator*, 102 F.4th at 188 (finding allegations that the defendant did not adequately monitor record keeping fees and chose an unreasonably expensive provider sufficient to state a claim); *see also Luense*, 541 F. Supp. 3d at 511 (finding allegations that a defendant failed to monitor investment performance and excessive record keeping fees sufficient to state a claim). Accordingly, Defendants' motion to dismiss Counts I and V is **DENIED**.[4] (Doc. 12). However, the motion is denied **without prejudice** to Defendants' ability to raise the same arguments on summary judgment or SVIA's ability to file a subsequent amicus brief.

[4] The Court notes that Defendants also move to dismiss Count IV, Plaintiffs' failure to monitor claim, because Muldoon fails to allege underlying conduct inconsistent with ERISA. (Doc. 13, at 50). Because the Court denies Defendants' motion to dismiss Muldoon's underlying claims, the Court **DENIES** Defendants' motion to dismiss Defendants' failure to monitor claim. (Doc. 12).

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part**. (Doc. 12). The motion is **GRANTED** to the extent Muldoon brings individual claims but **DENIED** to the extent Muldoon brings derivative claims **without prejudice** to Defendants' ability to raise the same issues on summary judgment or SVIA's ability to file a subsequent amicus brief.

An appropriate Order follows.

**BY THE COURT:**

**Dated: September 2, 2026**

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States District Judge**